# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 7, 2010            Decided July 6, 2010

No. 09-5352

ST. LUKE'S HOSPITAL,
APPELLANT

v.

KATHLEEN SEBELIUS, SECRETARY OF
HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00883-JR)

*Robert E. Mazer* argued the cause for the appellant. *Leslie DeMaree Goldsmith* was on brief. *James P. Holloway* entered an appearance.

*Joel McElvain*, Attorney, United States Department of Justice, argued the cause for the appellee. *Ronald C. Machen, Jr.*, United States Attorney, and *Michael S. Raab*, Attorney, *David S. Cade*, Acting General Counsel, and *Janice Hoffman*, Associate General Counsel, United States Department of Health and Human Services, were on brief. *R. Craig Lawrence*, Assistant United States Attorney, entered an appearance.

Before: GINSBURG, HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Appellant St. Luke's Hospital (St. Luke's), a non-profit hospital located in Bethlehem, Pennsylvania, submitted to the Centers for Medicare and Medicaid Services (CMS)[1] a claim for reimbursement regarding a $2.9 million loss allegedly incurred by Medicare provider Allentown Osteopathic Medical Center (Allentown) when it merged with St. Luke's through a "statutory merger." St. Luke's claimed as its loss the difference between the portion of the merger consideration ($4,848,188.60 in debt assumption) allocable to its depreciable assets and those assets' net book value. CMS disallowed the claim on the ground the merger lacked "reasonable consideration" and was therefore not a "bona fide" transaction as required for revaluation and loss reimbursement under 42 C.F.R. § 413.134(f) and (*l*).[2] St. Luke's sued the HHS Secretary in district court challenging the denial of its reimbursement claim. The district court granted summary judgment to the Secretary holding, inter alia, the Secretary had reasonably interpreted her own regulation to require that reasonable consideration be paid before depreciable assets may be revalued and the resulting losses reimbursed. *St. Luke's Hosp. v. Sebelius*, 662 F. Supp. 2d 99 (D.D.C. 2009). We affirm.

---

[1]CMS, formerly the Health Care Financing Administration (HCFA), administers the Medicare program on behalf of the Secretary of the United States Department Health and Human Services (HHS). *St. Elizabeth's Med. Ctr. of Boston, Inc. v. Thompson*, 396 F.3d 1228, 1230 (D.C. Cir. 2005).

[2]The statutory merger provisions appeared in subsection (*l*) of 42 C.F.R. § 413.134 at the time of the merger in January 1997 and we therefore cite thereto. The subsection has since been redesignated without change as subsection (k). *See* 65 Fed. Reg. 8660, 8662 (Feb. 22, 2000).

**I.**

A Medicare provider is entitled to compensation for the "reasonable cost" of Medicare services, 42 U.S.C. § 1395f(b)(1), which, pursuant to the Secretary's depreciation regulation, includes an "appropriate allowance for depreciation on buildings and equipment." 42 C.F.R. § 413.134(a). The depreciation allowance for an asset is generally based on its "historical cost," *id*. § 413.134(a)(2)—i.e., "the cost incurred by the present owner in acquiring the asset," *id* § 413.134(b)(1)—"[p]rorated over the estimated useful life of the asset." *Id*. § 413.134(a)(3). The resulting annual allowance is reimbursable to the extent the asset is used to provide Medicare services. In other words, the annual reimbursable allowance is equal to the actual cost divided by the number of years of its useful life and then multiplied by the percentage of the asset's use devoted to Medicare services in the given year.

In addition to an annual depreciation reimbursement, historically, a provider could receive a credit (or debit) upon disposition of the asset if the disposition resulted in a gain (or loss).[3] Under the depreciation regulation, an asset's gain or loss is equal to the difference between the consideration received upon disposition and its "net book value," which consists of the Medicare depreciable basis (generally the historical cost) less past Medicare depreciation allowances, 42 C.F.R. § 413.134(b)(9). *See Lake Med. Ctr. v. Thompson*, 243 F.3d 568, 569 (D.C. Cir. 2001). If the disposition of an asset before December 1, 1997 result[ed] in a gain or loss under this regime,

---

[3]In 1997, the Congress amended the Medicare Act to eliminate depreciation adjustments for assets after December 1, 1997, Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404, 111 Stat. 251, 400 (1997), and the Secretary amended the regulation accordingly, 63 Fed. Reg. 1379, 1380-82 (Jan. 9, 1998).

"an adjustment is necessary in the provider's allowable cost." 42 C.F.R. § 413.134(f)(1).

Under subsection (f) of the depreciation regulation, the "treatment of the gain or loss depends upon the manner of disposition of the asset." *Id*. § 413.134(f)(1). If an asset is disposed of through a "bona fide" sale, the treatment is straightforward: If there is a gain, the selling provider must compensate Medicare therefor; if there is a loss, Medicare reimburses the provider. *Id*. § 413.134(f)(2). If the sale of the assets is *not* a bona fide transaction, the regulation does not provide for any adjustment.[4] Under subsection (*l*), if the disposition is through a "statutory merger"—i.e., "a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving"—the merged corporation "is subject to the provisions of paragraph[] . . . (f) of [section 413.134] concerning . . . the realization of gains and losses." *Id*. § 413.134(*l*) (1997) (now § 413.134(k)). According to the preamble to the proposed rule, subsection (*l*)(2) "points out that a statutory merger is treated as a sale of assets." Fed. Health Ins. for the Aged and Disabled, Establishment of Cost Basis on Purchase of Facility as an Ongoing Operation, and Transactions Involving Provider's Capital Stock, 42 Fed. Reg. 17,485, 17,485 (proposed Jan. 17, 1977). This case involves such a statutory merger.

Allentown and St. Luke's, each a Medicare provider, signed a merger agreement on October 16, 1996, under which the

---

[4]Under subsection (f)(2), an asset disposed of by "scrapping" is treated like one disposed of in a bona fide sale. Other provisions of subsection (f) govern disposal of assets by sale within one year following termination of the provider's Medicare participation, exchange, trade-in or donation, demolition or abandonment, involuntary conversion and sale of a replacement or restored asset. 42 C.F.R. § 413.134(f)(3)-(8).

former was to merge with the latter effective January 1, 1997, with St. Luke's as the surviving entity.[5] For its part, St. Luke's agreed to (1) continue operating an acute inpatient services hospital at Allentown's campus for a minimum of two years (provided that a specified operating loss was not incurred) and indefinitely thereafter (provided that a cumulative operating surplus was maintained) and (2) invest in the Allentown "campus plant, equipment, programs, and services based on a well-defined plan that meets community needs and is economically responsible and feasible." Confidential Merger Agreement § 2.5, JA 188-89.

The merger went through as planned and all of Allentown's assets totalling approximately $25.1 million were transferred to St. Luke's. As consideration to Allentown, St. Luke's assumed Allentown's debt in the amount of approximately $4.8 million. After allocating the consideration among all of the transferred assets, St. Luke's filed a Medicare reimbursement claim totalling approximately $2.9 million for fiscal year 1996, treating the difference between the net book value of the

---

[5]The "statutory merger" was effected pursuant to Pennsylvania state law which provides: "Any two or more domestic nonprofit corporations . . . may, in the manner provided in this subchapter, be merged into one of such domestic nonprofit corporations, hereinafter designated as the surviving corporation . . . ." 15 Pa. Cons. Stat. § 5921. Once merged, "the several corporations parties to the merger or consolidation shall be a single corporation" and "[t]he separate existence of all corporations parties to the merger . . . shall cease, except that of the surviving corporation." *Id*. § 5929(a). "Except as otherwise provided by order, if any, obtained pursuant to section 5547(b) (relating to nondiversion of certain property), all the property, real, personal and mixed, and franchises of each of the corporations parties to the merger or consolidation, and all debts due on whatever account to any of them . . . shall be deemed to be vested in and shall belong to the surviving or new corporation . . . ." *Id*. § 5929(b).

depreciable assets and their allocated consideration as a loss. The Medicare fiscal intermediary denied St. Luke's claim and St. Luke's filed an appeal with the Provider Reimbursement Review Board (PRRB).[6]

In October 2000, while the appeal was pending, the Secretary issued a guidance document to determine if a statutory merger triggers a revaluation of the merged entity's depreciable Medicare assets. Clarification of the Application of the Regulations at 42 CFR 413.134(l) to Mergers and Consolidations Involving Non-profit Providers, Program Memorandum A-00-76 (Oct. 19, 2000) (PM A-00-76) (republished as PM A-00-96 (2001)). The document clarified that subsection (*l*)'s cross reference to subsection (f) requires that for "mergers and consolidations involving non-profit providers[,] . . . as with transactions involving for-profit entities, in order for Medicare to recognize a gain or loss on the disposal of assets, the merger or consolidation must occur between or among parties that are not related as described in the regulations at 42 CFR 413.17 and the transaction must involve one of the events described in 42 CFR 413.134(f) as triggering a gain or loss recognition by Medicare (*typically, a bona fide sale*, as defined in the [Provider Reimbursement Manual (PRM)] at §104.24[)]." PM A-00-76 at 1 (emphasis added); *see also id.* at

---

[6]A Medicare provider submits a yearly cost report to a fiscal intermediary (typically a private insurance company acting on the Secretary's behalf), which determines the reimbursement amount owed the hospital for the cost reporting year. *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 60 (D.C. Cir. 2010) (citing 42 C.F.R. § 405.1803). A provider dissatisfied with the determination may appeal to the PRRB. *Id.* (citing 42 U.S.C. § 1395oo(a), (f)). The Secretary, on her own motion, may reverse, affirm or modify the PRRB's decision within 60 days. 42 U.S.C. § 1395oo(f)(1). The provider may then seek review of the PRRB's or the Secretary's decision in district court. *Id.*

3 ("Notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a bona fide sale as required by regulation 413.134(f) and as defined in the PRM at §104.24."). PRM § 104.24, referenced in PM A-00-76, provides that a "bona fide sale" includes, *inter alia*, payment of "reasonable consideration" for the depreciable assets: "A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, *for reasonable consideration*. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest." PRM § 104.24 (emphasis added). PM A-00-76 elaborates on what constitutes reasonable consideration:

> As with for-profit entities, in evaluating whether a *bona fide* sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis. As set forth in PRM § 104.24, reasonable consideration is a required element of a *bona fide* sale. Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a *bona fide* sale. With regard to non-profit mergers or consolidations, often the sales price consists of assumed debt only, but may also include cash and/or new debt. Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time or to provide care to the indigent, may not be taken into account in evaluating the reasonableness of the overall consideration (even where such elements may be quantified in dollar

terms).  These factors are more akin to goodwill than to consideration.

PM A-00-76 at 3.

In January 2008, the PRRB issued its decision which reversed the Medicare fiscal intermediary and allowed St. Luke's claim.  Shortly thereafter, CMS, reviewing the PRRB decision pursuant to 42 U.S.C. § 1395oo(f)(1), *supra* note [6], issued a final agency decision reversing the PRRB and denying the claim.  *Allentown Osteopathic Med. Ctr. v. Blue Cross Blue Shield Ass'n*, Review of PRRB Dec. No. 2008-D15, 2008 WL 2550557 (Mar. 24, 2008) (CMS Decision).  CMS noted that Allentown did not obtain an appraisal to ascertain the assets' fair market value—although "a comparison of the sale price with the fair market value of the assets acquired is . . . required," *id*. at 20, 2008 WL 2550557, at *14—indicating  that "factors other than receiving the best price for its assets were motivations in the transaction," *id*. at 22, 2008 WL 2550557, at *14.  In addition, CMS found the value of the non-depreciable current assets ($5.8 million) together with the non-current long-term investments ($2.6 million) "well exceeded the value of the debt assumed" ($4.8 million), which was the sole consideration for the assets.  *Id*. at 23, 2008 WL 2550557, at *15.  Thus, CMS observed: "As a practical matter the depreciable assets were transferred for essentially no consideration." *Id*. at 22-23, 2008 WL 2550557, at *15.  "Accordingly," CMS concluded,  "as the transaction did not involve an arm's length transaction, the transaction was not a bona fide sale as required under the regulations and PRM for the recognition of a loss on the disposal of assets."  *Id*. at 23, 2008 WL 2550557, at *15.

St. Luke's sued the Secretary in district court, challenging the denial of its claim.  The district court granted summary judgment to the Secretary on September 30, 2009, concluding CMS did not act arbitrarily or capriciously in denying the claim on the ground the merger was not a bona fide transaction

because St. Luke's did not tender reasonable compensation for Allentown's assets. St. Luke's filed a notice of appeal on October 16, 2009.

**II.**

"Because we apply the same standard of review as the district court, we proceed de novo, as if [the plaintiff] had brought the case here on direct appeal." *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 244 (D.C. Cir. 2001). Accordingly, we review the CMS Decision under the Administrative Procedure Act to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). *See* 42 U.S.C. § 1395oo(f)(1) (district court action "shall be tried pursuant to the applicable provisions under chapter 7 of Title 5"). In so reviewing, we "give substantial deference to an agency's interpretation of its own regulations," according the agency's interpretation thereof "controlling weight" unless it be "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Our "broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' " *Id*. (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)). According the requisite deference, we uphold the Secretary's interpretation of subsections (f) and (*l*) of 42 C.F.R. § 413.134.

Subsection (*l*) by its express terms makes the merged provider "subject to the provisions of paragraph[] . . . (f) of this section concerning . . . the realization of gains and losses." The Secretary reasonably read this unrestricted cross-reference to subsection (f) as incorporating subsection (f)(2)'s requirement that a transaction be "bona fide" if the provider is to revalue the assets it transfers therein. *See* 42 C.F.R. § 413.134(f)(2) (rules

for recognizing gains and losses upon "the bona fide sale . . . of depreciable assets before December 1, 1997"). The Secretary then interpreted "bona fide" to encompass only transactions involving "reasonable consideration" that reflects the fair market value of the assets transferred. This too was reasonable. Fair market value is a hallmark of a bona fide transaction, as the Secretary has long acknowledged. *See United States v. Huber*, 603 F.2d 387, 398 (2d Cir. 1979) (defining " 'fair market value' " for Medicare asset depreciation as " 'price that the asset would bring *by bona fide bargaining* between well-informed buyers and sellers at the date of acquisition' ") (quoting 20 C.F.R. § 405.415(b)(2) (now 42 C.F.R. § 413.134(b)(2)) (emphasis added); *see also* Black's Law Dictionary 534 (5th ed. 1979) (same definition); *Ellis v. Mobil Oil*, 969 F.2d 784, 787 (9th Cir. 1992) ("It is settled law that a bona fide offer under the [Petroleum Marketing Practices Act] is measured by an objective market standard. To be objectively reasonable, an offer must approach fair market value.") (internal quotation and alteration omitted); *accord LCA Corp. v. Shell Oil Co.*, 916 F.2d 434, 440 (8th Cir. 1990); *and Slatky v. Amoco Oil Co.*, 830 F.2d 476, 483-84 (3d Cir. 1987). It is logical then to infer, as the Secretary has done in PM A-00-76, that a "large disparity" between the assets' purchase price and their fair market value indicates the underlying transaction is not in fact bona fide. Indeed, not only is the Secretary's a reasonable interpretation but, unlike St. Luke's, it leads to a reasonable result as well. Requiring a "reasonable" sale price, which reflects real market value, yields a gain or loss figure that approximates the actual gain or loss the provider has incurred since acquiring the asset. By contrast, the consideration paid in a transaction such as the merger here—an amount that simply reflects the level of debt the merged provider happens to carry at the time of the merger regardless of the assets' value—yields a figure unrelated to the actual change in the assets' value. *Cf. St. Luke's Hosp.*, 662 F. Supp. 2d at 103 (" '[I]t would be mere happenstance if the fair

market value of the merged entity's assets was equal to its known liabilities for which the surviving entity would become responsible.' " (quoting Pl.'s Mot. Summ. J. 17-18 (filed Oct. 8, 2008))) (alteration in original). As a consequence, using St. Luke's approach, Medicare would reimburse costs the provider has not in fact incurred—in contravention of the statutory goal to provide reimbursement only for the "reasonable cost" of healthcare services. 42 U.S.C. § 1395f(b)(1); *see id.* § 1395x(v)(1)(A) ("The reasonable cost of any services shall be the cost actually incurred . . . ."); *see also* Depreciation: Allowance for Depreciation Based on Asset Costs, 44 Fed. Reg. 3980, 3980 (Jan. 19, 1979) (adding provisions to 42 C.F.R. pt. 405 governing gain/loss upon disposal of depreciable assets "intended to assure that depreciation allowed under Medicare accurately reflects providers' costs of using assets for patient care"). For these reasons, we uphold the Secretary's interpretation of 42 C.F.R. § 413.134(f) and (*l*), memorialized in PM A-00-76, because it is not "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512.[7] Nonetheless, we address two arguments St. Luke's makes against applying the interpretation to the Allentown merger.[8]

First, St. Luke's contends that the "reasonable consideration" requirement is inconsistent with various HHS authorities in existence before PM A-00-76 issued in 2000,

---

[7]In so doing, we join the three other circuits that have addressed the issue. *See Albert Einstein Med. Ctr., Inc. v. Sebelius*, 566 F.3d 368, 378 (3d Cir. 2009); *Robert F. Kennedy Med. Ctr. v. Leavitt*, 526 F.3d 557, 562 (9th Cir. 2008); *Via Christi Reg'l Med. Ctr. v. Leavitt*, 509 F.3d 1259, 1275-76 (10th Cir. 2007).

[8]St. Luke's offers a host of other arguments against the Secretary's application of the depreciation regulation, which we summarily reject for the reasons stated by the district court. *See* 662 F. Supp. 2d at 104-05.

including a guidance document, opinion letters and individual adjudications—none of which, St. Luke's asserts, includes the reasonable consideration requirement. We perceive no inconsistency. While none of St. Luke's's authorities affirmatively establishes a reasonable consideration requirement, neither do they authorize reimbursement where the consideration falls far short of fair market value. Some of the cited documents simply recognize that depreciable assets may be revalued under the proper circumstances, without addressing what consideration may be required. *See, e.g.*, Medicare Intermediary Manual § 4502.6 (1987) (providing generic example of merger where "gain/loss to the seller and a reevaluation of the acquired assets to the buyer are computed"); Letter from William Goeller, Director of the Division of Payment and Reporting Policy, HCFA, to Irwin Cohen, Fulbright & Jaworski, at 1 (May 11, 1997) ("[m]ergers and consolidations of nonstock, nonprofit providers may give rise to revaluations of assets . . . and/or adjustments to recognize realized gains and losses" and "[i]f the transaction . . . meets the definition of either a statutory merger or consolidation as set forth in the regulations section . . . , then a revaluation of assets and/or an adjustment to recognize realized gains and losses may occur"); Letter from Charles R. Booth, Director, Office of Payment Policy, HCFA, to Michael Maher, Partner, Coopers & Lybrand, at 1 (Aug. 24, 1994) (agreeing transaction "appear[ed] to be a consolidation as defined in §4.133.134(k)(3)(i) requiring a determination of gain and loss" and addressing proper methodology for apportioning lump sum sales price among assets).[9] The cited adjudications, on the other hand, acknowledge, at least implicitly, the importance of bona fide transactions and reasonable consideration, setting out affirmative, individualized findings that the parties involved

_____

[9]Booth's letter noted in passing that the "fair market value exceed[ed] the sales price" but did not indicate by how much.

bargained in good faith and that the consideration tendered reasonably reflected fair market value. *See, e.g.*, *Broadway Unit of Vallejo Gen. Hosp. v. Blue Cross & Blue Shield Ass'n*, Medicare & Medicaid Guide (CCH) ¶ 34,529, at 9581-82 (HCFA Dec. 19, 1984) (noting PRRB finding that "contract met the definition of FMV set forth in 42 CFR 405.415(b)(2)" and "was the best evidence of FMV" and "sale was bona fide"), *aff'd*, *Vallejo Gen. Hosp. v. Bowen*, 851 F.2d 229 (9th Cir. 1988); *Ashland Regional Med. Ctr. v. Blue Cross & Blue Shield Ass'n*, 1998 WL 102268, at \*12 (PRRB Feb. 27, 1998) (finding "transaction was in fact a bona fide sale" and "parties negotiated in good faith to establish a fair market value or sales price"); *Lac Qui Parle Hosp. v. Blue Cross*, 1995 WL 933980, at \*9 (PRRB May 10, 1995) (finding "sale was an arm's length transaction and . . . negotiated in good faith" and upon inquiring of potential buyers, hospital was informed, "[w]ith respect to the fair market value of the facility, . . . the facility had very little value and little suitability for alternative uses"); *Edgecombe Gen. Hosp. v. Blue Cross & Blue Shield Ass'n*, Dec. No. 93-D87, Medicare & Medicaid Guide (CCH) ¶ 41,704 at 37,404 (PRRB Sept. 9, 1993) (reconciling difference between repurchase price of abandoned hospital and fair market value of functioning hospital at time of original sale on ground each amount "recognize[d] the reality and use of assets as of each transaction date").[10]

Second, St. Luke's contends the Secretary's application of the reasonable consideration requirement to the Allentown merger was an impermissible retroactive imposition of a new standard as set out in PM A-00-76. Again, we disagree. Within the context of an agency adjudication, the Secretary generally may lawfully interpret a regulation notwithstanding its

___

[10]In any event, the PRRB's decisions do not bind CMS or the Secretary. *See Community Care Found. v. Thompson*, 318 F.3d 219, 226-27 (D.C. Cir. 2003).

retroactive effect; as for PM A-00-76, which memorialized the Secretary's interpretation, any potential retroactive effect "was completely subsumed in the permissible retroactivity of the agency adjudication." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 424 (D.C. Cir. 1994) (citing *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081-86 (D.C. Cir. 1987) (en banc)). Accordingly, there was no impermissible retroactivity.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*