# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 4, 2010          Decided January 4, 2011

No. 09-1120

CITY OF IDAHO FALLS, IDAHO, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

Consolidated with 09-1315

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Charles R. Sensiba* argued the cause for petitioners. With him on the briefs were *Sam Kalen* and *John H. Clements*.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Thomas R. Sheets*, General Counsel, *Robert H. Solomon*, Solicitor, and *Judith A. Albert*, Senior Attorney.

Before: TATEL and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In 1987, the Federal Energy Regulatory Commission issued a regulation that used a United States Forest Service rental fee schedule to set annual charges for hydropower projects occupying federal land. Since then, FERC has issued annual updates to reflect the Forest Service's revised fee schedule. In 2008, however, the Forest Service began using a significantly different valuation methodology than the one FERC had reviewed and endorsed in its 1987 regulation. FERC nonetheless used the revised Forest Service schedule when it issued its 2009 update— resulting in substantially higher rates to many licensees. Petitioners and intervenors in this case, a group of hydropower licensees who pay FERC's annual rental fees, challenge the Commission's 2009 update, arguing that it was required to go through notice and comment before it could impose charges according to the revised Forest Service methodology. For the reasons set forth in this opinion, we grant the petition and vacate FERC's 2009 rental fee update.

**I.**

Under section 10(e)(1) of the Federal Power Act (FPA), 16 U.S.C. § 803(e)(1), licensees of hydropower projects regulated by FERC must "pay to the United States reasonable annual charges in an amount to be fixed by the Commission" to, among other things, "recompens[e] [the federal government] for the use, occupancy, and enjoyment of its lands or other property." FERC and its predecessor, the Federal Power Commission, have utilized various methodologies to set these land use charges. Originally, the Federal Power Commission calculated annual fees through individual project appraisals. *See Update of the Federal Energy Regulatory Commission's Fees Schedule for Annual Charges for the Use of Government Lands* ("Rehearing

Order"), 129 FERC ¶ 61,095, at 61,430 (2009). When such appraisals proved inefficient, FERC adopted national per acre land values, which it used in combination with an annual rate of return to set land use fees. *Id.* at 61,430–31.

In 1985, the Department of Energy's Inspector General issued a report finding that FERC's methodology led to significant under-collection because it relied on outdated land value averages. *See id.* at 61,431. The Report recommended that FERC revise its regulations so that its fees would reflect current fair market value and also suggested that the Commission cease using a national average that failed to account for land value variations. *See id.* Responding to these and other recommendations and following notice and comment rulemaking, FERC issued Order No. 469, which established a new methodology for assessing annual rental fees. *See* Revision of the Billing Procedures for Annual Charges for Administering Part I of the Federal Power Act and to the Methodology for Assessing Federal Land Use Charges, Order No. 469, 52 Fed. Reg. 18,201 (May 14, 1987). In that Order, FERC explained that it would use the schedule published by the Forest Service to determine rental fees for so-called linear rights-of-way across National Forest System lands. *Id.* at 18,202. A "linear right-of-way" is a "right-of-way for a linear facility, such as a road, trail, pipeline, electronic transmission line, fence, water transmission facility, or fiber optic cable." 36 C.F.R. § 251.51.

As described in Order No. 469, the Forest Service methodology was based on a survey conducted jointly by the Forest Service and the Bureau of Land Management (BLM) of market values for the types of land those agencies allowed linear rights-of-way to occupy. *See* Order No. 469, 52 Fed. Reg. at 18,205. Using the survey data, the Forest Service and BLM assigned each county in the United States (excluding

counties in Hawaii and Alaska) to one of eight different fee zones based on the county's "raw land values," with values ranging from $50 per acre for Zone One to $1,000 per acre for Zone Eight. *See* Linear Rights-of-Way Fees, 51 Fed. Reg. 44,014, 44,017 (Dec. 5, 1986). To determine rental fees, the Forest Service multiplied the applicable zone values in its index by two additional factors designed respectively to account for the land use impact of different rights-of-way and to provide the government with a reasonable rate of return for using its land. *See id.* at 44,014–16. The Forest Service also included an annual adjustment to account for inflation. *See id.* at 44,017.

In adopting the Forest Service fee schedule, FERC acknowledged that the BLM-Forest Service valuation methodology was "not precisely fitted to hydroelectric projects." Order No. 469, 52 Fed. Reg. at 18,205. FERC nonetheless concluded that the linear rights-of-way zone values were "the best approximation available," and it noted that "[m]ost commenters" shared its view that the Forest Service index "would be more representative of the fair market value of the type of land most often used for hydroelectric projects than any of the other . . . methodologies" proposed in the Commission's initial rulemaking notice. *Id.* Among the alternative methodologies FERC considered and rejected was a proposal to use a land value index published by the United States Department of Agriculture that provided state-by-state per acre averages for the value of farm land and buildings. According to FERC, "[c]ommenters almost unanimously object[ed] to the use of [this] agricultural land value index," arguing that farm land values were typically much higher than the values of federal land used for hydropower projects and that substantial adjustments to the index would have been needed to account for the value of farm buildings, arable land, and private

ownership. *Id.* at 18,206. FERC agreed, concluding that "[t]he agricultural index would require . . . major adjustments" and so would be an inefficient metric for the value of land used by hydropower projects. *Id.*

At the end of Order No. 469, FERC promulgated Regulation 11.2, which implemented the order by amending the Commission's FPA regulations. The provision relevant to this case, section 11.2(b), provides that "[p]ending further order of the Commission and subject to adjustments as conditions may warrant, annual charges for the use of government lands . . . will be set on the basis of the schedule of rental fees for linear rights-of-way"—an appendix that reproduced the Forest Service schedule. 18 C.F.R. § 11.2(b). The provision added that "[t]he Commission, by its designee the Executive Director, will update its fees schedule to reflect changes in land values established by the Forest Service. The Executive Director will publish the updated fee schedule in the Federal Register." *Id.*

For over twenty years from 1987 to 2008, BLM and the Forest Service made no changes to their linear rights-of-way fee schedule except for the annual inflation adjustment. Despite generally recognized increases in land value in most areas, the agencies' zone values remained static. *See* Rehearing Order, 129 FERC at 61,432. In accordance with Regulation 11.2, FERC's Executive Director published annual fee schedule updates to reflect the Forest Service's most recent inflation-adjusted schedule. *See id.* at 61,432 & n.19.

In 2005, Congress, concerned that zone values for linear rights-of-way had become outdated, directed both the Forest Service and BLM to revise their per acre rental fee zone values "to reflect current values of land in each zone." 42 U.S.C. § 15925. Following notice and comment, BLM issued

the required update in October 2008.  *See* Update of Linear Right-of-Way Rent Schedule ("BLM Order"), 73 Fed. Reg. 65,040 (Oct. 31, 2008).  Days later, the Forest Service published its own notice, formally adopting BLM's revisions to the linear rights-of-way fee schedule.  *See* Fee Schedule for Linear Rights-of-Way Authorized on National Forest System Lands, 73 Fed. Reg. 66,591 (Nov. 10, 2008).

The methodology BLM and the Forest Service used to set rates in this revised schedule differed in several significant ways from their previous methodology, with each input in the agencies' calculation formula changing in some respect.  The most significant change, and the one the parties focus on here, related to zone values.  Responding to Congress's command to use up-to-date data, the two agencies chose to replace their internally-generated 1986 index with a new index called the Census of Agriculture, which the National Agricultural Statistics Service (NASS) publishes every five years.  The NASS Census reports average per acre land and building values by county (or other relevant geographical unit) for each state and lists individual values for cropland, woodland, pastureland, rangeland, and a broad "other" category that includes non-commercial, non-residential building lots, wasteland, and land with roads and ponds.  BLM Order, 73 Fed. Reg. at 65,043.  BLM and the Forest Service determined not only that the NASS Census is a reliable data source, but also that the land types measured in the census are comparable to land they administer.  *Id.*  To set zone values for each county using this data, the agencies employed the average per acre land and building values from the NASS Census and then reduced them by twenty percent to eliminate the added value of irrigated cropland and land encumbered by buildings.  *Id.* at 65,043–44.  In addition, because the land values contained in the NASS Census exceeded those in the 1986 BLM-Forest Service survey, the agencies increased the

number of zones from eight to twelve, with zone values ranging from $250 per acre for Zone One to $100,000 per acre for Zone Twelve. *See id.* at 65,045–46, 65,049.

In January 2009, and setting the stage for the issue before us, FERC sent letters to all hydropower licensees apprising them of the Forest Service's revised fee schedule and explaining that the new schedule would cause annual federal land use charges to "increase substantially" for "many projects." Acting pursuant to Regulation 11.2, FERC's Executive Director subsequently issued the Commission's annual fee update notice on February 17, which incorporated the Forest Service's new rate schedule. Update of the Federal Energy Regulatory Commission's Fees Schedule for Annual Charges for the Use of Government Lands," ("2009 Update"), 74 Fed. Reg. 8,184 (Feb. 24, 2009) (codified at 18 C.F.R. pt. 11, app. A). Like all previous updates issued by the Executive Director, the notice was published in both the Federal Register and the Code of Federal Regulations.

A group of licensees, including petitioners and intervenors in this case, filed a timely rehearing request. The group contended that the 2009 Update amounted to a rulemaking that FERC improperly issued without notice and an opportunity for comment. They also argued that by adopting the new Forest Service land valuations without any independent inquiry, FERC unlawfully delegated to that agency its FPA section 10(e)(1) responsibility to set "reasonable annual charges" for hydropower licensees. 16 U.S.C. § 803(e)(1).

Denying the rehearing petition, FERC first stated that the petition was procedurally improper because the licensees were either effectively challenging the final actions of other agencies (the Forest Service and BLM) or collaterally

attacking Regulation 11.2. *See* Rehearing Order, 129 FERC at 61,433–34. Notwithstanding these purported procedural failings, FERC addressed the merits and concluded that no notice and comment was required prior to the 2009 Update because the update did not qualify as a legislative rule. FERC explained that the 2009 Update was not a rulemaking of any kind, but was instead a procedural action required by Regulation 11.2. Alternatively, FERC determined that even if the 2009 Update were a rulemaking, it was an interpretive rule rather than a legislative rule because it "did not create new law, rights, or duties" but rather "simply informed licensees of the updated fees" according to the procedure the Commission had followed since 1987. *Id.* at 61,434–35.

Central to FERC's reasoning was its insistence that although the Forest Service and BLM concededly modified their land valuation methodology prior to the 2009 Update, the Commission's own methodology—issuing updates based on the Forest Service rental fee schedule for linear rights-of-way—remained constant. FERC acknowledged that changes the Forest Service and BLM made to their fee schedules "might be cause for the Commission to reexamine the propriety of using the BLM-Forest Service calculations," but it nonetheless contended that the Executive Director's ministerial act of issuing the 2009 Update "cannot be considered a change in Commission regulation." *Id.* at 61,436. FERC explained that although Order No. 469 "discuss[ed] various methodologies," Regulation 11.2 itself adopted the BLM-Forest Service index as the basis for determining its land use fees without recognizing any "exception for changes in the underlying methodology of BLM and the Forest Service." *Id.* at 61,434–35. Indeed, FERC observed, the regulation "specifically contemplates" that the Forest Service's land values might change and that the Commission would continue to use them. *Id.* at 61,435.

Responding to the licensees' criticism that the new Forest Service zone value index was based on agricultural land values and that FERC had expressly rejected the use of another agricultural land value index in Order No. 469, the Commission insisted that the data now being used by the Forest Service and BLM differed from the index at issue in Order No. 469. Therefore, although FERC took no position on "whether the new BLM-Forest Service methodology results in a reasonably accurate valuation of federal land used for hydropower purposes" because it believed the question was not properly presented, it found no conflict between the methodological change by the Forest Service and BLM and the Commission's own prior conclusions in Order No. 469. *Id.* at 61,436.

FERC also rejected the licensees' argument that by issuing the 2009 Update, it improperly delegated to other agencies its section 10(e)(1) responsibility to fix reasonable land use charges. Noting that it adopted the BLM-Forest Service linear rights-of-way fee schedule in Order No. 469 after full review, FERC asserted that its decision to rely on other agencies for data updates was consistent with its statutory responsibilities. *See id.* at 61,436–37.

One Commissioner dissented on the ground that FERC "ha[d] not assessed" the new BLM-Forest Service methodology to determine whether it was appropriate for arriving at reasonable annual charges for hydropower licensees. *Id.* at 61,437. Lamenting that the decision to forgo public comment "reduces confidence in the fairness of government process," the dissent argued that the majority "should have opened a notice of inquiry or other public rulemaking process" before accepting the new methodology and the higher rates it produced. *Id.*

This petition for review followed. Urging us to vacate the 2009 Update, the licensees argue that FERC failed to provide notice and an opportunity for public comment as required by section 553 of the Administrative Procedure Act (APA), 5 U.S.C. § 553. They also contend that the 2009 Update violates FPA section 10(e)(1) and that FERC acted arbitrarily and capriciously in denying the rehearing request.

## II.

The key issue before us is this: in promulgating the 2009 Update, did FERC change its methodology for setting rental fees charged to hydropower licensees from the methodology it had adopted in Order No. 469 and Regulation 11.2? If the answer is yes, then FERC violated APA section 553. Having established through public rulemaking in Regulation 11.2 a legally-binding methodology for setting future rates for licensees, FERC may modify that methodology only after notice and comment. *See Alaska Prof'l Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C Cir. 1999) (" 'Rule making,' as defined in the APA, includes not only the agency's process of formulating a rule, but also the agency's process of modifying a rule." (citing 5 U.S.C. § 551(5)); *Batterton v. Marshall*, 648 F.2d 694, 705–09 (D.C. Cir. 1980) (holding that the Department of Labor's adoption of a new methodology for collecting and computing employment statistics was a rule requiring notice and comment where those statistics were used as part of a statutory formula for allocating job program funds between states). Conversely, if the answer is no—that is, if as FERC held in its Rehearing Order, the 2009 Update was mandated by Regulation 11.2 and was issued in accordance with the Commission's long-standing interpretation of that regulation—then it is equally clear that notice and comment rulemaking was unnecessary. Whether characterized as an interpretive rule or just a procedural action, a notice doing no more than faithfully

implementing established regulations does not require renewed notice and comment. *Cf. Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 588 (D.C. Cir. 1997) (concluding that the Department of Justice's interpretation of its regulation in a manual supplement was "not sufficiently distinct or additive to the regulation to require notice and comment"). Moreover, if FERC's understanding of the 2009 Update is correct, then the licensees' only remedy for the significant rate increase caused by the new Forest Service rental fee schedule would be the one FERC suggests: petitioning for a new rulemaking on the grounds that the factual premises underlying the Commission's adoption of Regulation 11.2 have "fundamental[ly] change[d]." *Midwest Indep. Transmission Sys. Operator v. FERC*, 388 F.3d 903, 911 (D.C. Cir. 2004) (describing the standard of review for an agency's decision not to initiate a rulemaking).

FERC argues that it has reasonably interpreted Regulation 11.2 to permit it to use the Forest Service's 2008 land values without first allowing for notice and comment. Recall that section 11.2(b) of the regulation adopts the Forest Service's linear rights-of-way fee schedule as the basis for setting hydropower land use fees and also instructs FERC's Executive Director to "update [the Commission's] fees schedule to reflect changes in land values established by the Forest Service." 18 C.F.R. § 11.2(b). According to FERC, the Executive Director followed this command exactly when he issued the 2009 Update implementing the Forest Service's revised zone valuations. Rehearing Order, 129 FERC at 61,435. True, in "chang[ing]" its land values, the Forest Service, in conjunction with BLM, jettisoned its prior valuation methodology by replacing its own survey with an index produced by another agency for different land categories. According to FERC, however, Regulation 11.2 "does not specify any underlying methodology as a condition

for the Commission's continued use" of the Forest Service's figures. *Id.* Because of this, and because "[t]he new methodology utilized by BLM and the Forest Service still leads to a valuation of rental fees for linear rights-of-way," FERC contends that Regulation 11.2 compelled the 2009 Update. *Id.*

Of course, we owe an agency's interpretation of its own regulation substantial deference, giving the interpretation " 'controlling weight' " unless it is " 'plainly erroneous or inconsistent with the regulation.' " *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 904–05 (D.C. Cir. 2010) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). But even under this highly deferential standard, we are unable to accept FERC's interpretation.

FERC claims that when it adopted the Forest Service's rental fee schedule for linear rights-of-way in Regulation 11.2, it did so independently of the Service's then-existing land valuation methodology. But the rulemaking process tells a different story. In its initial notice of proposed rulemaking, FERC requested that commenters "[i]dentify the benefits and detriments of each index" that it proposed. *See* Revisions to the Billing Procedures for Annual Charges for Administering Part I of the Federal Power Act and to the Methodology for Assessing Federal Land Use Charges, 51 Fed. Reg. 211, 213 (Jan. 3, 1986). After BLM and the Forest Service finalized their zone value index, FERC issued a supplemental request for comments, asking whether it "should apply [the Forest Service's] *methodology*." Notice Requesting Supplemental Comments, 52 Fed. Reg. 82, 83 (Jan. 2, 1987) (emphasis added). It issued the supplemental request, FERC explained, to give the public an opportunity to provide "specific comments" on the BLM-Forest Service index now that its details were known. *Id.* Having requested these comments,

FERC then issued Order No. 469, in which it evaluated proposed methodologies and explained that "the zone values established by the Forest Service for linear rights-of-way are the best approximation available of the value of lands" that the Commission administered, whereas the alternative agricultural index it had also proposed was "not an efficient measure of land value for hydropower projects." Order No. 469, 52 Fed. Reg. at 18,205–06. Given this focus, we think it entirely implausible that FERC adopted the Forest Service linear rights-of-way index without regard to the methodology the Service uses to generate it.

FERC's interpretation of Regulation 11.2 is especially dubious given that it would compel the Commission to accept, without notice and comment, any new methodology adopted by the Forest Service—including even one that the Commission itself had expressly rejected. Indeed, FERC candidly concedes as much. As discussed above, FERC held in its order denying rehearing that so long as the Forest Service's methodology leads to the valuation of rental fees for linear rights-of-way, the Commission must use the Forest Service's updated values regardless of how the Service sets those figures. *See* Rehearing Order, 129 FERC at 61,435. Therefore, as FERC counsel acknowledged at oral argument, Recording of Oral Arg. 24:33–25:17, unless the Commission promulgated new rules, its interpretation of Regulation 11.2 would require it to use the Forest Service's updated rate schedule for linear rights-of-way even if the Forest Service amended its methodology to use the very same agricultural land value index that the Commission rejected when it issued Order No. 469. This is absurd. Whatever ambiguity may exist in Order No. 469 and Regulation 11.2, FERC clearly decided against using the Department of Agriculture land value index. Any interpretation of Regulation 11.2 that fails to rule out subsequent use of this index by way of an "update"

cannot possibly stand. To hold otherwise would allow FERC to detach Regulation 11.2's meaning from the public rulemaking that produced it, undermining the values of public participation, fairness, and informed agency decisionmaking that the notice-and-comment process is designed to foster. *See Nat'l Elec. Mfrs. Ass'n v. EPA*, 99 F.3d 1170, 1174 (D.C. Cir. 1996) (discussing the purposes of the APA's notice-and-comment requirements).

FERC insists that there is no conflict between the Forest Service's current methodology and Order No. 469 because the NASS Census data, as adjusted by BLM and the Forest Service, differ significantly from the agricultural land value index that the Commission previously disapproved. *See* Rehearing Order, 129 FERC at 61,436. Even if that is true, the problem with FERC's interpretation of Regulation 11.2 is that nothing turns on these differences. Simply put, FERC cannot escape the absurd implications of its interpretation by assuring us that the facts of this case are not quite so extreme.

FERC's interpretation of Regulation 11.2 suffers from a second fatal defect: if the regulation obliges the Commission to adopt any change the Forest Service makes to its rental fee schedule, then it conflicts with the Commission's responsibilities under FPA section 10(e)(1), which requires FERC to "fix[] . . . reasonable annual charges" for the use of federal lands by hydropower projects, as well as to "seek to avoid increasing the price to the consumers of power by such charges." 16 U.S.C. § 803(e)(1). Interpreting this provision, we have held that FERC's power to set charges is exclusive and that its duty to ensure that rates are reasonable is both mandatory and non-delegable. *See City of Tacoma v. FERC*, 331 F.3d 106, 115 (D.C. Cir. 2003) ("[T]he authority to assess charges under section 10(e)(1) of the FPA is FERC's exclusive responsibility."); *E. Columbia Basin Irrigation Dist.*

*v. FERC*, 946 F.2d 1550, 1557 (D.C. Cir. 1991) ("[O]nly the Commission has authority to administer Section 10(e)."). Although nothing in section 10(e)(1) prevents FERC from using externally generated information to set appropriate rates, the statute does prohibit the Commission from relying on outside cost assessments without engaging in its own independent review to ensure that, in its judgment, the resulting rates are reasonable. *See City of Tacoma*, 331 F.3d at 115–16 (holding that FERC acted contrary to the FPA by failing to review cost reports submitted by other agencies as part of its fee assessment for hydropower licensees).

When FERC issued Order No. 469, it evaluated the 1986 BLM-Forest Service linear rights-of-way index and concluded that it represented the best available methodology for assessing the fair market value of the type of land used for hydropower projects. Order No. 469, 52 Fed. Reg. at 18,205. This is exactly what section 10(e)(1) requires: even though FERC relied on Forest Service and BLM data, it was the Commission, not those two agencies, that determined this schedule would produce reasonable rates. But if, as FERC now claims, Regulation 11.2 commits it to using the Forest Service's current schedule regardless of how that agency decides to value the land it administers, then the Commission has violated section 10(e)(1) by allowing the Forest Service to determine the market value of land used by hydropower licensees and by extension to establish the rates for use of that land. Indeed, FERC itself illustrates this delegation by faulting the licensees for failing to object to the new BLM-Forest Service methodology in the rulemaking conducted by those agencies. *See* Rehearing Order, 129 FERC at 61,433; *see also* Resp't's Br. 33 (repeating this argument). But neither BLM nor the Forest Service had any authority to consider whether their new methodology for valuing linear rights-of-way accurately reflected the value of land used for

hydropower projects. Under section 10(e)(1), that evaluation is for FERC alone to make.

FERC contends that if its reliance on the Forest Service's updated land valuations violates section 10(e)(1), then Regulation 11.2 is the source of the problem, and the licensees may no longer challenge that regulation because they failed to do so when it was issued in 1987 and the limitations period has long since run. *See* 16 U.S.C. § 825*l*(b). We disagree. For this collateral attack argument to have any merit, we would have to conclude that FERC's interpretation of Regulation 11.2 is reasonable notwithstanding the unlawful delegation resulting from that interpretation. Doing so would require us to assume that affected parties should have anticipated in 1987 that the Commission might someday interpret Regulation 11.2 as requiring it to accept major changes in the Forest Service's land valuation methodology without further review. In other words, displaying a surprisingly cynical view of the administrative process, FERC believes that the licensees should have realized that the Commission might sometime in the future interpret the regulation so broadly as to subvert its section 10(e)(1) responsibilities by delegating its rate-setting authority to the Forest Service, and it asks us to shield this unlawful action from review on the grounds that the Commission's broad interpretation reasonably follows from the unqualified language of its existing rule. It is certainly true, as FERC counsel pointed out at oral argument, Recording of Oral Arg. 30:48-30:52, that petitioners and intervenors here are sophisticated actors who can be expected to parse Commission rules closely to protect their interests. Even so, it is entirely unreasonable to think that anyone, including seasoned licensees, would ever have interpreted Regulation 11.2 as compelling the Commission to set future rates based on whatever BLM and the Forest Service

considered fair market value for lands those agencies oversee. In short, we may not defer to an agency interpretation that would cause a regulation to violate the very statute the agency administers. *See Stinson v. United States*, 508 U.S. 36, 45 (1993) (explaining that deference to an agency's interpretation of its own regulations is only owed where that interpretation "does not violate the Constitution or a federal statute").

To sum up, FERC's interpretation of Regulation 11.2 improperly divorces the regulation's text from both the rulemaking process from which it emerged and the underlying statutory scheme pursuant to which it was issued, making it "plainly erroneous" and "inconsistent with the regulation." *See St. Luke's Hosp.*, 611 F.3d at 904–05. In reaching this conclusion, we by no means suggest that FERC forever bound itself in Order No. 469 to the land values in the 1986 BLM-Forest Service index. To the contrary, section 11.2(b) expressly allows updates to account for land value changes made by the Forest Service. The Executive Director's updating authority, however, is necessarily confined to Forest Service changes produced according to the original methodology FERC reviewed and approved.

Having rejected FERC's interpretation of Regulation 11.2, we can easily complete our task. FERC nowhere disputes the fact that the rental fees listed in its 2009 Update are the product of significant changes in the Forest Service's methodology for valuing linear rights-of-way. Because FERC previously approved and used the old Forest Service methodology, its implicit acceptance of the new methodology in the 2009 Update marked a change in its own regulations. For FERC to make such a change, APA section 553 required notice-and-comment rulemaking. *See Alaska Prof'l Hunters Ass'n, Inc.*, 177 F.3d at 1034.

We grant the petition for review and vacate the 2009 Update.

*So ordered.*