# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 19, 2012         Decided May 14, 2013

No. 12-1106

BLUE RIDGE ENVIRONMENTAL DEFENSE LEAGUE, ET AL.,
PETITIONERS

v.

NUCLEAR REGULATORY COMMISSION AND THE UNITED
STATES OF AMERICA,
RESPONDENTS

WESTINGHOUSE ELECTRIC COMPANY LLC,
INTERVENORS

———

Consolidated with 12-1151

———

On Petition for Review of Orders of the
United States Nuclear Regulatory Commission

———

*Diane Curran* argued the cause for petitioners. With her
on the briefs were *Mindy Goldstein* and *John Runkle*.

*Robert M. Rader*, Senior Attorney, U.S. Nuclear
Regulatory Commission, argued the cause for respondents.
With him on the brief were *J. David Gunter II*, Trial Attorney,
U.S. Department of Justice, *John F. Cordes, Jr.*, Solicitor,

U.S. Nuclear Regulatory Commission, and *Jeremy M. Suttenberg*, Attorney.

*Randall L. Speck*, *David L. Cousineau*, *M. Stanford Blanton*, *Millicent W. Ronnlund*, and *Kathryn M. Sutton* were on the brief for intervenors Westinghouse Electric Company LLC, *et al.*, in support of respondents.

Before: BROWN, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

EDWARDS, *Senior Circuit Judge*: This case arises from actions taken by the Nuclear Regulatory Commission ("NRC" or "Commission") approving (1) an application by Southern Nuclear Operating Company ("Southern") for combined licenses to construct and operate new Units 3 and 4 of the Vogtle Nuclear Power Plant and (2) an application by Westinghouse Electric Company ("Westinghouse") for an amendment to its already-approved AP1000 reactor design on which the Vogtle application relied. In approving the applications, NRC applied the regulatory scheme incorporated in 10 C.F.R. Part 52 covering the licensing of commercial nuclear power reactors. *See Nuclear Info. Res. Serv. v. NRC*, 969 F.2d 1169, 1170 (D.C. Cir. 1992) (en banc) (upholding two-part regulatory scheme in 10 C.F.R. Part 52).

In 2009, after a contested evidentiary hearing in which Petitioners participated, NRC granted Southern an early site permit for Vogtle Units 3 and 4. In 2008, Southern applied for combined licenses. A second contested proceeding was held in which Petitioners participated. The application for the early site permit was supported by an Environmental Impact Statement ("EIS"); the application for combined licenses was supported by the initial EIS and an updated EIS. After the close of the combined-license hearing record, Petitioners sought to reopen the hearing to litigate contentions relating to the nuclear accident at the Fukushima Dai-ichi complex in

Japan on March 11, 2011. In the wake of the Fukushima accident, NRC commissioned a Task Force to reevaluate nuclear safety regulations in the United States. Petitioners unsuccessfully sought to forestall the licensing of the Vogtle reactors and the approval of the modified AP1000 design until NRC had fully considered and implemented the Task Force recommendations.

After the Task Force recommendations were issued and approved by NRC, Petitioners pursued various actions to compel the agency to supplement its EIS and to delay any action on the combined license and AP1000 design rulemaking proceedings until after the agency had implemented the Task Force recommendations. Petitioners contended, *inter alia*, that Vogtle's EIS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, because it did not address allegedly new and significant environmental implications of the Task Force's recommendations after Fukushima. NRC ruled that Petitioners' challenges were premature, that the agency's existing procedural mechanisms were sufficient to ensure licensees' compliance with not-yet-enacted regulatory safeguards, and that the licensing and rulemaking proceedings could continue without delay. NRC further held that Petitioners had failed to satisfy the contention-specificity requirements of 10 C.F.R. § 2.309(f)(1), which state that the proponents of contentions must indicate with specificity the claims they wish to litigate. *See Union of Concerned Scientists v. NRC*, 920 F.2d 50, 51-52 (D.C. Cir. 1990). NRC also held that Petitioners had failed to identify any environmentally significant information from the Task Force recommendations suggesting a deficiency in the Vogtle EIS. NRC thus declined to reopen the combined-license hearing record under 10 C.F.R. § 2.326.

4

In late 2011, NRC issued its rule approving the AP1000 amended design, and in 2012 it authorized issuance of the combined licenses. Petitioners then filed the petitions for review giving rise to this action. Petitioners raise three principal contentions for consideration by the court. First, Petitioners claim that NRC abused its discretion in refusing to reopen the hearing record in the Vogtle licensing proceeding. Second, Petitioners assert that NRC unreasonably denied them a right to participate in a mandatory hearing at which NRC technical staff confirmed that the Fukushima accident had not presented new and significant information that would require a supplemental EIS for Vogtle. Finally, Petitioners argue that NRC abused its discretion in approving the AP1000 reactor design without first supplementing the AP1000 Environmental Assessment ("EA") that contained important information regarding "Severe Accident Mitigation Design Alternatives" applicable to Vogtle. Because we find no merit in any of these contentions, we deny the petitions for review.

## I. REGULATORY BACKGROUND

### A. Reactor Design Certification

Under 10 C.F.R. Part 52, Subpart B, a party may request a "standard design certification" for the approval of a nuclear power plant design. *See* 10 C.F.R. § 52.41. Once a design is certified through this generic process, a future applicant may rely on the already-approved design. *See id.* § 52.43(a). Design certification by NRC requires notice-and-comment rulemaking and culminates in publication in the Federal Register as a "design certification rule." *See id.* § 52.54.

When a proposed design certification rule is published, NRC's associated EA is published for comment at the same

time. *See id.* § 51.31(b)(1). Because a reactor design is certified without reference to any specific plans for its construction, NRC has determined by rule that every proposed design certification or amendment requires only an EA, not a more comprehensive EIS. *See id.* §§ 51.31(b)(1)(i), 51.32(b)(1)-(2).

The EA for a design certification addresses only one topic: the costs and benefits of any Severe Accident Mitigation Design Alternatives that were considered and not incorporated into the final design. *See id.* § 51.30(d). When a proposal is made to modify an approved design certification rule, the amendment may rely on the EA generated for the original design certification rule and need only consider (1) whether the proposed design change renders any previously rejected design alternatives cost-beneficial and (2) whether the design change results in the identification of any new design alternatives that necessitate a previously unperformed cost-benefit analysis. *See id.* § 51.30(d). In other words, modifications to the original EA are necessary only if the proposed design change amendment alters the cost-benefit calculus concerning any Severe Accident Mitigation Design Alternatives.

## B.  Combined Operating Licenses

The Atomic Energy Act authorizes NRC to issue a combined operating license for both the construction and operation of new reactors after a public hearing. *See* 42 U.S.C. § 2235(b). Any such license must be accompanied by a full EIS, 10 C.F.R. §§ 51.75, 51.92(b), (d), (e), and may rely on and incorporate by reference an approved standard design certification, *id.* § 51.75(c)(2).

NRC must afford interested parties an opportunity to participate in a contested hearing subject to additional procedural requirements. *See* 42 U.S.C. § 2239(a). However,

in order to initiate such a contested hearing, NRC regulations require that interested parties submit contentions that are supported by "sufficient information to show that a genuine dispute exists with the applicant/licensee on a material issue of law or fact." 10 C.F.R. § 2.309(f)(1)(vi). In addition, interested parties "must set forth with particularity the contentions sought to be raised" and must:

> (ii) Provide a brief explanation of the basis for the contention;
>
> * * *
>
> (v) Provide a concise statement of the alleged facts or expert opinions which support the requestor's/petitioner's position on the issue and on which the petitioner intends to rely . . . together with references to the specific sources and documents [at issue]; [and]
>
> * * *
>
> (vii) In a [combined license] proceeding . . . the information must be sufficient, and include supporting information showing, *prima facie*, that one or more of the acceptance criteria in the combined license have not been met . . . .

*Id.* § 2.309(f)(1)(ii), (v), (vii). When interested parties are allowed to intervene, "[t]he scope of the Intervenors' participation in adjudications is limited to their admitted contentions, i.e., they are barred from participating in the uncontested portion of the hearing." *Exelon Generation Co., LLC*, 62 N.R.C. 5, 49 (2005).

NRC also holds a separate "mandatory" hearing before issuing a combined license. *See* 42 U.S.C. §§ 2235(b), 2239(a); *see also Exelon Generation*, 62 N.R.C. at 49-50. The mandatory hearing does not address contentions raised by the parties, and participation is limited to the applicant and NRC staff. *See Exelon Generation*, 62 N.R.C. at 49-50. The

mandatory NRC hearing determines the adequacy of the NRC staff's review of the application.

Separate regulations govern when NRC must reopen a closed hearing. *See* 10 C.F.R. § 2.326(a). In their briefs to this court, the parties focused on NRC's application of its contention-admissibility standards, not on whether the agency erred in declining to reopen the combined-license hearing record. Because we find that NRC properly denied Petitioners' contentions, and because the standards for reopening a closed proceeding are higher than those for admitting a new contention, *see Luminant Generation Co., LLC*, CLI-12-07, slip op. at 14 n.47 (Mar. 16, 2012), we need not reach the application of NRC's reopening regulations.

## C. Environmental Requirements

NEPA mandates that a federal agency take a "hard look" at any major undertaking by assembling an EIS. This

> ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The EIS must address all reasonably foreseeable environmental impacts, including reactor accidents, even if the probability of such an occurrence is low. *See* 40 C.F.R. § 1502.22(b).

As a major federal action, NRC's issuance of a combined operating license requires an EIS. *See* 10 C.F.R. § 51.20(b). NRC regulations require preparation of an EIS both at the early site permit stage and at the combined operating license stage. *See* 10 C.F.R. § 51.75(b) (requiring EIS for early site

permit); *id.* § 51.75(c)(1) (requiring supplementation for combined operating license).

Once NRC has prepared an EIS, it must continue to evaluate the environmental consequences of the project and supplement the EIS, as necessary, even after initial approval. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 370-78 (1989). This ongoing duty is mitigated, however, by a "rule of reason," which excuses the agency from supplementing an environmental report based only on "remote and highly speculative consequences." *Deukmejian v. NRC*, 751 F.2d 1287, 1300 (D.C. Cir. 1984) *reh'g granted and opinion vacated on other grounds sub nom. San Luis Obispo Mothers for Peace v. NRC*, 760 F.2d 1320 (D.C. Cir. 1985) and *on reh'g sub nom. San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26 (D.C. Cir. 1986).

The EIS must be submitted for public comment. *See TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006); 40 C.F.R. § 1502.9. Although Petitioners contend that similar public comment is mandatory for all EAs, we have held that "the agency has significant discretion in determining when public comment is required with respect to EAs." *TOMAC*, 433 F.3d at 861.

### D. Fukushima Accident and NRC Fukushima Task Force

On March 21, 2011, a catastrophic accident occurred at the Fukushima Dai-ichi Nuclear Power Station in Honshu, Japan. *See* U.S. NUCLEAR REGULATORY COMM'N, RECOMMENDATIONS FOR ENHANCING REACTOR SAFETY IN THE 21ST CENTURY: THE NEAR-TERM TASK FORCE REVIEW OF INSIGHTS FROM THE FUKUSHIMA DAI-ICHI ACCIDENT 7 (July 12, 2011) ("Task Force Report"). NRC appointed a Task Force to study the regulatory implications of the accident for the United States. The Task Force was charged to

conduct a systematic and methodical review of U.S. Nuclear Regulatory Commission processes and regulations to determine whether the agency should make additional improvements to its regulatory system and to make recommendations to the Commission for its policy direction, in light of the accident at the Fukushima Dai-ichi Nuclear Power Plant.

*Id.* at vii. The Commission asked the Task Force to identify "potential or preliminary near term/immediate operational or regulatory issues" related to natural disasters, severe accident mitigation, and emergency preparedness, and to propose other improvements in light of the Fukushima accident. *Union Elec. Co.*, CLI-11-05, 74 N.R.C. 141, 147 (2011); *see also* Task Force Report at viii.

NRC's Fukushima Task Force issued its report in July 2011, concluding that NRC's "current regulatory approach, and more importantly, the resultant plant capabilities" demonstrate "that a sequence of events like the Fukushima accident is unlikely to occur in the United States and some appropriate mitigation measures have been implemented, reducing the likelihood of core damage and radiological releases." Task Force Report at vii. The Task Force supported completing work on the then-pending AP1000 design certification rulemaking "without delay" and noted that "all of the current early site permits [e.g., Vogtle Units 3 and 4] already meet the requirements" of the Task Force Report recommendation governing seismic and flooding analysis. *Id.* at 71-72. In sum, the Task Force Report recommended that both the AP1000 rulemaking and the Vogtle license application proceedings continue without interruption.

The Task Force offered twelve recommendations which, "taken together are intended to clarify and strengthen the [NRC's] regulatory framework." *See id.* at viii. The Task Force grouped these recommendations into five categories:

"Clarifying the Regulatory Framework," "Ensuring Protection," "Enhancing Mitigation," "Strengthening Emergency Preparedness," and "Improving the Efficiency of NRC Programs." *Id.* at ix.

NRC approved the Task Force's recommendations and urged implementation by 2016. In March 2012, NRC implemented two Task Force recommendations, one concerning licensees' abilities to protect spent fuel rods in unpredictably dangerous conditions and the other proposing development of a new rule to upgrade "station blackout" requirements for power failures both within and outside a plant.

## II.  FACTUAL BACKGROUND

### A.  AP1000 Design Certification

NRC first issued a design certification rule approving Westinghouse's AP1000 design in 2006. Along with this design certification rule, NRC prepared an EA that analyzed sixteen Severe Accident Mitigation Design Alternatives and rejected all sixteen on cost-benefit grounds. *See* Environmental Assessment by the U.S. Nuclear Regulatory Commission Relating to the Certification of the AP1000 Standard Plant Design, Docket No. 52-006 (2006), *reprinted in* J.A. 866-902.

Westinghouse subsequently applied for an amendment to the approved AP1000 reactor design. NRC received and considered over 200 public comments, most of which urged delaying resolution of the AP1000 design amendment proceeding until the lessons learned from the Fukushima accident were applied to NRC regulations. *See* AP1000 Design Certification Amendment, 76 Fed. Reg. 82,079-01,

82,079-81 (Dec. 30, 2011) (outlining history of AP1000 design certification rule).

On December 30, 2011, after considering these comments, NRC declined to suspend or delay the design certification rulemaking proceeding, emphasizing that the AP1000 design was already compliant with many of the Task Force recommendations. *See id.* NRC concluded that no Severe Accident Mitigation Design Alternatives were cost-beneficial and that no supplemental EA was necessary. *See* Environmental Assessment by the U.S. Nuclear Regulatory Commission Relating to Certification of the Amendment to the AP1000 Standard Plant Design, Docket No. 52-006, 5-6 (Dec. 22, 2011), *reprinted in* J.A. 224-25.

NRC certified the AP1000 design and stressed the ongoing nature of Commission review of designs, stating that:

> even if the Commission concludes at a later time that some additional action is needed for the AP1000, the NRC has ample opportunity and legal authority to modify the AP1000 [design certification rule] to implement NRC-required design changes, as well as to take any necessary action to ensure that holders of [combined licenses] referencing the AP1000 also make the necessary design changes.

AP1000 Design Certification Amendment, 76 Fed. Reg. at 82,081. As a result, NRC concluded "that no changes to the AP1000 [design certification rule] are required at this time," *id.*, and noted that the Task Force itself endorsed completion of the AP 1000 rulemaking "without delay," *id.* at 82,083.

## B. Vogtle Combined Operating Licenses

On August 15, 2006, Southern applied for an early site permit for Vogtle Units 3 and 4. A coalition of community action organizations, including several Petitioners in this case, sought a hearing on the application and intervened on three admitted contentions related to NRC's draft EIS for the site.

NRC assigned the conduct of the licensure proceeding to a three-member Atomic Safety and Licensing Board ("Board"), which considered Petitioners' contentions in a series of on-the-record hearings. The Board ruled against Petitioners on all three contentions, and NRC denied review, ending the contested portion of the hearing. The Board issued its final initial decision in August 2009, after holding its mandatory sufficiency review and questioning Southern and NRC staff, and approved the Vogtle early site application.

Southern subsequently applied for combined operating licenses for Vogtle Units 3 and 4. As with the early site permit proceeding, NRC prepared an EIS for this licensing action, which included consideration of the potential for severe accidents and their consequences. *See* Environmental Impacts of Postulated Accidents, Environmental Impacts of Operation at the Vogtle Electric Generating Plant Site, § 5.10 (Mar. 2011) ("Vogtle EIS"), *reprinted in* J.A. 805-09; Southern Nuclear Operating Company, Inc.; Notice of Availability of the Final Supplemental Environmental Impact Statement for Vogtle Electric Generating Plant Units 3 and 4; Combined License Application Review, 76 Fed. Reg. 16,645-02 (Mar. 24, 2011).

In response, Petitioners brought three contentions to the Board, which denied two and admitted the third, a safety-related contention. After consideration of the contention, the Board granted summary disposition against the intervenors, finding that the contention failed to present a material factual dispute. The Board declined to admit an additional environmental contention and concluded the contested portion of the proceeding. A second licensing Board was established to consider another contention in April 2010; it denied the request, and NRC affirmed.

In April 2011, shortly after the Task Force was appointed, Petitioners and other organizations submitted an

Emergency Petition, asking NRC to suspend all pending licensing decisions, including the decision whether to issue a combined license for Vogtle 3 and 4, while it investigated the implications of the Fukushima accident. The Commission denied these requests for a suspension. *See generally Union Elec. Co.*, CLI-11-05, 74 N.R.C. 144, 150-51, 175-76 (2011).

At the same time, Petitioners submitted a petition requesting that NRC immediately suspend the rulemaking for the amendment of the AP1000 design certification pending evaluation of the implications of the Fukushima accident. *Id.* at 172-73. Petitioners asked NRC to undertake "a comprehensive review of the Fukushima accident to develop lessons learned for new reactor designs and the subsequent development and implementation of new regulatory safeguards to protect public health and safety." *Id.* at 172. The Commission denied the request for immediate postponement as premature, but directed NRC staff to consider the submissions as comments to the AP1000 rulemaking. *Id.* at 172-73. Petitioners filed additional supplemental comments requesting that NRC consider the environmental implications of the Fukushima accident and the Task Force Report. Supplemental Comments by the AP1000 Oversight Group et al. Regarding Failure of Rulemaking on Certification, *In the Matter of AP1000 Design Certification Amendment*, NRC-2010-0131 (Sept. 29, 2011), *reprinted in* J.A. 326-36.

In August 2011, after the Task Force issued its report, several Petitioners submitted motions to reopen the record of the then-closed Vogtle licensing proceeding and admit contentions challenging the failure of NRC to order a supplemental Vogtle EIS to address the environmental implications of the Task Force Report. *See PPL Bell Bend, L.L.C.*, LBP-11-27, slip op. (Oct. 18, 2011). Two groups of Petitioners submitted substantively identical proposed contentions, which read as follows:

> The EIS for . . . Vogtle fails to satisfy the requirements of NEPA because it does not address the new and significant environmental implications of the findings and recommendations raised by NRC's Fukushima Task Force Report, including seismic-flood and environmental justice issues. As required by 10 C.F.R. § 51.92(a)(2) and 40 C.F.R. § 1502.9(c), these implications must be addressed in a supplemental Draft EIS.

*Id.* at 6. The contention was supported by declarations which alleged that the Fukushima accident and the Task Force Report presented new and significant information about risks to public health and safety. *See id.* at 9-10 (summarizing supporting declarations).

On September 9, 2011, the Commission denied Petitioners' April 2011 Emergency Petitions with respect to the Vogtle licensing decision and the AP1000 rule. The Commission concluded that "nothing learned to date requires immediate cessation of our review of license applications or proposed reactor designs." *Union Elec.*, CLI-11-05, 74 N.R.C. at 161. In addition, the Commission found that there was no cause to require a "generic" environmental review because the Fukushima accident did not present "new and significant" information. *Id.* at 166-67. The Commission further noted that "we do not know today the full implications of the Japan events for U.S. facilities. Therefore, any generic NEPA duty – if one were appropriate at all – does not accrue now." *Id.* at 167.

The Commission did, however, leave open the possibility that an individual NEPA contention in a particular licensing proceeding might require additional review, stating that "[i]f the NRC determines that changes to its current environmental assessment rules are warranted, we can revisit whether an individual licensing review or adjudication should be held in

abeyance pending the outcome of a relevant rulemaking." *Id.* at 174.

On October 18, 2011, the Board rejected as premature Petitioners' August 2011 contentions, "seeking to revive" several closed adjudicatory proceedings, including the Vogtle licensing. *See PPL Bell Bend*, LBP-11-27, slip op. at 1. The Board read the Commission's decision in CLI-11-05 as instructing "precisely and definitively that it remains much too early in the process of assessing the Fukushima event in the context of the operation of reactors in the United States to allow any informed conclusion regarding the possible safety or environmental implications of that event." *Id.* at 13. The Board also noted that Petitioners did not indicate "any unique characteristics of the [Vogtle] site that might make the content of the Task Force report of greater environmental significance to that reactor than to United States reactors in general." *Id.* at 13-14. Because CLI-11-05 invited contentions in licensing proceedings that alleged particular risks from the specific site, the Board found this lack of specificity dispositive.

Also on October 18, 2011, the Commission adopted all of the Task Force recommendations and ordered NRC staff to implement them within the following five years. *See Luminant Generation Co., LLC*, LBP-11-36, slip op. at 4-5 (Nov. 30, 2011). Upon the Commission's adoption of the Task Force recommendations, several Petitioners resubmitted their contentions and asked the Board to reconsider its denial of their contentions in light of the Commission's decision to adopt all of the Task Force recommendations. *See id.*

On November 30, 2011, the Board denied the motion to reconsider, finding that the Commission's adoption of the Task Force recommendations had not "materially changed matters." *Id.* at 5. The Board noted that there had been no express request that it reconsider the framework underlying its

prematurity decision in LBP-11-27, and it declined to do so. *Id.* at 3-4.

On February 9, 2012, the Commission handed down its opinion resulting from its September 27 and 28, 2011, mandatory hearing on the Vogtle licensing application. *See S. Nuclear Operating Co.*, CLI-12-02, slip op. at 2 (Feb. 9, 2012). Under Commission precedent, participation in the hearing was appropriately limited to Southern and NRC staff, and the hearing addressed only the sufficiency of the staff's review of Southern's license application. *See Exelon Generation*, 62 N.R.C. at 49-50. At the hearing, NRC technical staff confirmed that the AP1000 design certification and the Vogtle licenses met current safety and environmental standards. *S. Nuclear Operating Co.*, CLI-12-02, slip op. at 22. NRC staff testified that Fukushima-like accidents have an "extremely low probability," despite their "potentially high consequences." *Id.* at 74. The Commission considered the likelihood and consequences of potential severe accidents similar to the Fukushima accident and found that the risks to the AP1000 reactor design at the Vogtle site were "lower than those for current generation plants." *Id.* at 72-73.

NRC approved the combined license applications for the Vogtle 3 and 4 reactors at the conclusion of the mandatory hearing. The Commission found that the staff's review adequately supported the requisite safety and environmental findings under 10 C.F.R. §§ 52.97, 51.107(a) & (d), and 50.10, that all NEPA requirements had been met, and that the staff had followed an appropriate process for assessing "new and significant" information. *See id.* at 2, 79. In addition, the Commission restated that no plant, including Vogtle, would be exempt from Task Force recommendations enacted in the future:

> All affected nuclear plants will be required to comply with NRC direction resulting from lessons learned from the

> Fukushima accident, regardless of the timing of issuance of the affected licenses. We therefore expect the new Vogtle units will comply with all applicable "post-Fukushima" requirements.

*Id.* at 82. NRC found it premature to order implementation of the Task Force recommendations, as many recommendations were still in development and not yet formulated into regulations. Instead, the Commission stated that it would not establish new regulatory processes or requirements until after taking sufficient time to "ensure that any new requirements are technically justified and implemented appropriately." *Id.*

Commission Chairman Jaczko dissented from the Commission's decision, stating that he would not "authorize issuance of these licenses without any binding obligation that these plants will have implemented the lessons learned from the Fukushima accident before they operate." *Id.* (Jaczko, C., dissenting) slip op. at 1. Even Chairman Jaczko, however, did not argue that a supplemental EIS was necessary before the Vogtle licenses could proceed; his dissent was based solely on his belief that the Commission should have demanded assurances of compliance with future safety requirements, not current environmental shortcomings.

On March 16, 2012, the Commission upheld the Board's denial of Petitioners' contention, agreeing that Petitioners had "not identified environmental effects from the Fukushima Dai-ichi events that can be concretely evaluated at this time, or identified specific new information challenging the site-specific environmental assessments" for Vogtle. *Luminant Generation Co.*, CLI-12-07, slip op. at 9. The Commission held that the Task Force's recommendations did not themselves identify any environmentally significant information for Vogtle, and Petitioners did not explain how any particular recommendation related to the Vogtle licenses in a manner that mandated a supplemental EIS. NRC held that

the Task Force recommendations, standing alone, did not provide sufficient support for an admissible contention. Rather, the Commission held that a valid contention must "include facts sufficient to demonstrate a genuine dispute" with the license application; a contention that merely alludes to Task Force findings "is too vague . . . for litigation." *Id*. at 13-14.

The Commission also found that Petitioners failed to demonstrate that the Task Force Report presented a "seriously different picture of the environmental impact of the proposed project from what was previously envisioned" that would necessitate a supplemental EIS. *Id.* at 10. NRC held that "reference to the Task Force Report recommendations alone, without facts or expert opinion that explain their significance for the unique characteristics" of the Vogtle reactors "does not provide sufficient support" to demand further NEPA review. *Id.* at 13. NRC ruled that the same lack of specificity was also fatal to Petitioners' attempt to meet NRC's "more stringent reopening rule" and to require Southern to supplement the Vogtle EIS. *Id.* at 14 n.47.

On April 16, 2012, the Commission denied Petitioners' motion to stay the effectiveness of the Vogtle licensing decision, pending review by this court. The Commission reiterated its conclusion that Petitioners "have not demonstrated that the Fukushima events or any regulatory response to those events would raise environmental impacts that differ significantly from the impacts that the NRC has already reviewed and addressed" in approving the Vogtle licenses. *See S. Nuclear Operating Co.*, CLI-12-11, slip op. at 12-13 (Apr. 16, 2012).

On February 17, 2012, Petitioners sought review of the NRC's AP1000 rule. A month later, Petitioners sought review of the Commission's decisions rejecting Petitioners' contentions and of all the authorizations resulting from the

approval of the Vogtle licenses. On April 3, 2012, we consolidated the petitions for review. After the Commission denied Petitioners' motion for a stay, Petitioners moved for a stay in this court, which we denied.

On appeal before us now are (1) the amended AP1000 design certification rule, (2) the Commission's rejection of Petitioners' contentions and motions to reopen the record to supplement the Vogtle EIS, and (3) all the licensing authorizations resulting from the Commission's decision to allow the Vogtle licenses to go forward. The specific decisions implicated are:

- The AP1000 rule, Final Rule, AP1000 Design Certification Amendment, 76 Fed. Reg. 82,079 (Dec. 30, 2011); and

- The Commission's rejection of Petitioners' contentions and motions to reopen the record, and the resulting licenses and work authorizations:

  - *Luminant Generation Co., LLC*, CLI-12-07, slip op. (Mar. 16, 2012);

  - *Luminant Generation Co., LLC*, LBP-11-36, slip op. (Nov. 30, 2011);

  - Vogtle Electric Generating Plant, Units 3 and 4; Issuance of Combined Licenses and Limited Work Authorizations and Record of Decision, 77 Fed. Reg. 12,332-02 (Feb. 29, 2012);

  - Combined License No. NPF-91 (Vogtle Electric Generating Plant Unit 3) (Feb. 10, 2012), *reprinted in* J.A. 35;

  - Combined License No. NPF-92 (Vogtle Electric Generating Plant Unit 4) (Feb. 10, 2012), *reprinted in* J.A. 53;

- o Limited Work Authorization No. LWA-001, (Vogtle Electric Generating Plant Unit 3) (Feb. 10, 2012), *reprinted in* J.A. 71; and

- o Limited Work Authorization No. LWA-002, (Vogtle Electric Generating Plant Unit 4) (Feb. 10, 2012), *reprinted in* J.A. 83.

## III.  STANDARD OF REVIEW

This court will set aside an agency rule or licensing decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also, e.g.*, *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1144 (D.C. Cir. 2005).

The arbitrary and capricious standard also controls our review of agency actions with respect to any substantive environmental issues that are properly before the court. We may set aside such actions only if we find that NRC committed "a clear error of judgment." *Marsh*, 490 U.S. at 385. We owe deference to NRC's decision not to supplement either its EA for the AP1000 reactor design or its EIS for the Vogtle reactors. *See id.* (finding that the agency "conducted a reasoned evaluation of the relevant information and reached a decision that, although perhaps disputable, was not 'arbitrary or capricious'"); *see also Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 853-55 (9th Cir. 2013) (reviewing decision not to supplement an EIS under the deferential "arbitrary or capricious" standard).

To the extent that NRC's technical judgments and predictions are before the court for review, we "must generally be at [our] most deferential." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). We are obligated to "defer to the wisdom of the agency,

provided its decision is reasoned and rational." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009).

In reviewing NRC's interpretations of its own rules – here, notably, its rules governing the reopening of closed proceedings and governing contention admissibility – we give "controlling weight" to the agency's constructions unless they are "plainly erroneous or inconsistent with the regulation." *City of Idaho Falls, Idaho v. FERC*, 629 F.3d 222, 228 (D.C. Cir. 2011).

NRC's interpretation of its enabling legislation is reviewed pursuant to the familiar standards enunciated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984). *See also, e.g.*, *Nuclear Info. Res. Serv.*, 969 F.2d at 1173. An agency's interpretation of its governing statute is entitled to no judicial deference if "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If, as in this case, "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44. We have previously endorsed NRC's "high standards" for reopening closed hearings and the "stringency of those criteria." *Deukmejian*, 751 F.2d at 1316. We are therefore bound to defer to NRC's implementation of its contention-specificity regulations.

We are also "obliged to defer to the operating procedures employed by an agency when the governing statute requires only that a 'hearing' be held." *Union of Concerned Scientists*, 920 F.2d at 54. As a result, we consider with due deference NRC's rejection of Petitioners' objections to the agency procedures at issue here.

## IV.  ANALYSIS

### A.  NRC's Refusal to Admit Petitioners' Contentions

NRC regulations dictate the criteria that a party's contention must meet in order to initiate a contested hearing. *See* 10 C.F.R. § 2.309(f)(1). Because we have held that NRC's "procedural rules [under 10 C.F.R. § 2.309(f)] do not facially violate the Atomic Energy Act or the APA [and] they are also consistent with NEPA," *Union of Concerned Scientists*, 920 F.2d at 56-57, and because we find that NRC reasonably applied these rules in evaluating Petitioners' contentions, we defer to NRC's rejection of Petitioners' contentions.

After carefully reviewing the record in this case, we hold that the Commission acted reasonably in denying Petitioners' contentions on the grounds that they (1) failed to "[p]rovide a . . . statement of the alleged facts or expert opinions which support the requestor's/petitioner's position," 10 C.F.R. § 2.309(f)(1)(v), and (2) failed to "include references to specific portions of the . . . environmental report . . . that the petitioner disputes and the supporting reasons," *id.* § 2.309(f)(1)(vi). *See Luminant Generation Co.*, CLI-12-07, slip op. at 13 n.43.

> *1.  The Task Force Report Alone Was Not a "New and Significant" Circumstance Requiring a Supplemental EIS*

Petitioners failed to indicate any environmental data that were not considered in the EIS. Because Petitioners failed to point to any specific shortcoming in the EIS, NRC reasonably found Petitioners' contentions insufficient to support a contested hearing. The Commission clearly stated its reasons for refusing to admit Petitioners' contentions:

> We expect Petitioners to identify information that was not considered in the environmental review for the application at issue and explain, with asserted facts or expert opinion, how it presents "a seriously different picture of the environmental impact of the proposed project from what was previously envisioned."

*Id.* at 13. This explanation is well-supported by the record and represents a reasonable interpretation of NRC's contention-specificity regulations. *See* 10 C.F.R. § 2.309(f).

Under NEPA, NRC is obligated to undertake a supplemental EIS only when presented with "substantial changes in the proposed action that are relevant to environmental concerns" or "new and significant circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" after the EIS is assembled. 10 C.F.R. § 51.92(a)(1)-(2); *see also id.* § 51.72(a)(1)-(2). "New and significant" information presents "a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." *Hydro Res., Inc.*, 50 N.R.C. 3, 14 (1999); *see also Marsh*, 490 U.S. at 374 (looking to "the value of the new information to the still pending decisionmaking process" and requiring a supplemental EIS only if the new information is sufficient to show environmental effects "in a significant manner or to a significant extent not already considered"). The determination as to whether information is either new or significant "requires a high level of technical expertise"; thus, we "defer to the informed discretion of the [Commission]." *Marsh*, 490 U.S. at 377.

Petitioners contend that the Task Force recommendations give rise to an obligation to supplement the Vogtle EIS because the recommendations may alter NRC regulations in the years ahead. Thus, in Petitioners' view, the Vogtle licenses necessarily must be delayed until the

recommendations are finalized. We rejected a similar line of reasoning in *Union of Concerned Scientists*:

> Information raised in the environmental reports does not amount to a new material "issue" simply because it adds marginal weight to the case of an opponent or a proponent of a license; the reports instead raise a new "issue" only when *the argument itself (as distinct from its chances of success)* was not apparent at the time of the application. Although the concepts of new issues and new evidence are analytically distinct, we recognize that in practice they can converge – the demarcation line may depend on how the "issue" is stated. Still, whether an actual new "issue" is raised is a matter for the NRC to determine in the first instance and is reviewed deferentially.

920 F.2d at 55.

It is also noteworthy that the position taken by the Commission in this case is consistent with holdings reached by Atomic Safety and Licensing Boards in licensing proceedings for other locations. In these proceedings, the Boards have found that the Task Force Report alone does not provide a sufficient foundation for an admissible contention. *See Pac. Gas & Elec. Co.*, LBP-11-32, slip op. at 19 (Nov. 18, 2011) (finding a proposed contention inadmissible because the petitioner "offer[ed] nothing to link the outcome of the Fukushima events" to the pending license renewal application), *review denied at Pac. Gas & Elec. Co.*, CLI-12-13 (Jun. 7, 2012); *Fla. Power & Light Co.*, LBP-11-33, slip op. at 8 (Nov. 21, 2011) (rejecting proposed contention because the petitioners "allege[d] no facts linking the events at Fukushima to the sufficiency of NEPA-related documents" for the pending combined license application). Obviously, these Board decisions do not control the disposition of this case, but they do give further credence to the view that the Task Force Report alone does not support Petitioners' position.

In this case, NRC's original EIS for Vogtle considered precisely the types of harm that occurred as a result of the Fukushima accident. The EIS considered consequences and mitigation of severe accidents involving reactor core damage and the release of fission products. *See* Vogtle EIS at § 5.10, *reprinted in* J.A. 805-09; *see also* Final Environmental Impact Statement for an Early Site Permit (ESP) at the Vogtle Electric Generating Plant Site, § 5.10.2 (Aug. 2008) ("Vogtle ESP EIS"), *reprinted in* J.A. 835-44. In addition, the EIS for the Vogtle early site permit evaluated the human health impacts, economic costs, and land contamination risks, concluding that the environmental risks associated with severe accidents from an AP1000 reactor at the Vogtle site "would be small compared to risks associated with operation of the current-generation reactors at [Vogtle]" and were "well below NRC safety goals." Vogtle ESP EIS at 5-81, 5-89, *reprinted in* J.A. 836, 844.

Petitioners' contentions provide no explanation as to how the Task Force Report recommendations raise previously unaddressed issues. *See Union of Concerned Scientists*, 920 F.2d at 55. The Commission reasonably concluded that, for their contentions to be admitted for consideration, Petitioners were required to cite *particular* information that was missing from the Vogtle EIS based on *particular* recommendations from the Task Force. *See Luminant Generation Co.*, CLI-12-07, slip op. at 13; *PPL Bell Bend*, LBP-11-27, slip op. at 13. Petitioners failed to do this.

Petitioners argue that, once NRC described the Fukushima accident as "significant," the agency was obligated to generate new environmental reports for all implicated pending sites and reactor designs. This argument is clearly unavailing, as it relies on Petitioners' elision of "safety significance" with "environmental significance." In the case on which Petitioners chiefly rely, *San Luis Obispo Mothers*

*for Peace v. NRC*, 449 F.3d 1016 (9th Cir. 2006), NRC had categorically declined to consider any environmental consequences resulting from terrorism-related threats. The Ninth Circuit thus overturned the Commission's decision. *Id.* at 1031. The situation here is quite different. In this case, NRC thoroughly analyzed the environmental consequences of severe accidents for Vogtle. *See* Vogtle ESP EIS at § 5.10.2, *reprinted in* J.A. 835-44; Vogtle EIS at § 5.10, *reprinted in* J.A. 805-09. Chairman Jaczko, the lone dissenter from the issuance of the Vogtle licenses, objected because he sought greater assurances that the Vogtle reactors would remain in compliance with future *safety* regulations. The Chairman did not contend that his concerns about safety standards created present *environmental* concerns; and he did not claim that there were any present shortcomings at the Vogtle site or any need for additional NEPA review. *See generally S. Nuclear Operating Co.*, CLI-12-02, slip op. (Jaczko, C., dissenting).

"[N]ew information about nuclear power plant safety arising between the time of the initial application and the commencement of operations" does not necessarily provide cause for additional NEPA review. *Union of Concerned Scientists*, 920 F.2d at 55. And it does not create such cause here because the EIS addressed and dismissed precisely the risks that gave rise to the Fukushima accident. The Commission reasonably found that it was not obligated to postpone its decision "until inchoate information matures into something that might later affect [its] review." *Luminant Generation Co.*, CLI-12-07, slip op. at 14; *see also N.J. Dep't of Envtl. Prot. v. NRC*, 561 F.3d 132, 143 (3d Cir. 2009) (holding that "precautionary actions to guard against a particular risk do not trigger a duty to perform a NEPA analysis").

Furthermore, as noted above, both the Task Force and NRC noted that further regulatory initiatives would be

possible, as necessary, after the Commission studied the Task Force recommendations. *See S. Nuclear Operating Co.*, CLI-12-02, slip op. at 81-82. However, merely because the Commission might impose more stringent safety regulations after carefully assessing the Task Force recommendations does not mean that the agency's present actions are inconsistent with NEPA.

Without an explanation from Petitioners as to what specific "new and significant" environmental information NRC failed to consider, or what deficiency in the existing EIS it failed to rectify, NRC reasonably found that Petitioners' contentions did not warrant a contested hearing. Petitioners' attempts to rely on future safety concerns in lieu of present environmental risks do not create an obligation for further NEPA review.

### 2. *Petitioners' Contentions Lacked Specific Links Between the Fukushima Accident and the Vogtle Site*

After the Task Force issued its report, the Commission rejected as premature Petitioners' requests for a generic NEPA review arising out of the Task Force Report. The Commission held that if "new and significant information comes to light that requires consideration as part of the ongoing preparation of application-specific NEPA documents, the agency will assess the significance of that information, as appropriate." *Union Elec.*, CLI-11-05, 74 N.R.C. at 167. Petitioners do not challenge this decision on appeal, but instead "attempt to distinguish CLI-11-[0]5 by claiming that [the Commission's] holding there rested on a finding that sufficient information was not yet available to conduct a *generic* analysis," and that such information now exists. *Luminant Generation Co.*, CLI-12-07, slip op. at 9. The Commission rejected this argument and upheld the Board's ruling "that Petitioners did not relate their contention to any unique characteristics of the particular site at issue, and

therefore, the contention was akin to the generic type of NEPA review that we declared premature in CLI-11-[0]5." *Id.* (citing *PPL Bell Bend*, LBP-11-27, slip op. at 13-14).

The First Circuit, addressing an appeal from NRC's denial of other post-Fukushima objections to plant licensing actions, held that a petitioner's "mere pointing to a piece of information and speculating that the results of the [environmental risk analysis] may be different was not sufficient to meet" the Commission's stringent standards for reopening a closed proceeding. *Massachusetts v. NRC*, 708 F.3d 63, 76-77 (1st Cir. 2013). We agree. We therefore uphold NRC's determination that its rejection of Petitioners' contentions as "premature" was governed by its decision in CLI-11-05.

In light of the Commission's decision in CLI-11-05, Petitioners were obligated to present a contention sufficiently detailed and specifically related to the challenged reactor location to demonstrate how the contention differed from the "premature" generic request that the Commission denied in CLI-11-05. Absent any evidence – or even allegation – linking the conditions at the Vogtle site itself to the Task Force recommendations, NRC appropriately applied the applicable contention-specificity regulations in declining to admit Petitioners' contentions. We defer to the Commission's judgment. *See Idaho Falls*, 629 F.3d at 228.

## B. Declining to Allow Petitioners to Intervene in Mandatory Hearing

Petitioners challenge their exclusion from NRC's mandatory hearing regarding the Vogtle licenses. Their claim is meritless. As discussed above, there was no need for an additional contested hearing once NRC reasonably denied Petitioners' contentions. Petitioners participated in two

contested hearings related to the Vogtle licenses. They had no right to participate in the Commission's "mandatory" hearing.

Mandatory hearings are "sufficiency" reviews, designed to assess the efforts of the NRC staff and determine whether the safety and environmental record is sufficient to support the license. Participation in these hearings is limited to the license applicant and NRC staff. *Exelon Generation*, 62 N.R.C. at 49-50 (2005) (petitioners are "barred from participating in the uncontested portion of the hearing"). Petitioners point to no statutory or regulatory provision, nor agency practice, affording them a right to participate in a mandatory hearing. We therefore reject their claim on this point.

## C. Approval of AP1000 Reactor Design Certification

Finally, we hold that NRC properly declined to supplement its existing EA for the AP1000 design certification amendment before adopting the final rule. The EA for a design certification amendment considers only whether the design change that is the subject of the proposed amendment renders a previously rejected Severe Accident Mitigation Design Alternative cost beneficial or identifies a new alternative necessitating its own cost-benefit analysis. *See* 10 C.F.R. § 51.30(d). The Commission reasonably found that the existing AP1000 EA adequately considered Severe Accident Mitigation Design Alternatives.

In considering the AP1000 design certification amendment, NRC reexamined the probability that a severe accident might occur and concluded that potential design changes did not affect its original evaluations. Environmental Assessment by NRC Relating to the Certification of the Amendment to the AP1000 Standard Plant Design, Docket No. 52-006 at 5, (Dec. 22, 2011), *reprinted in* J.A. 224; *see also* AP1000 Design Certification Amendment, 76 Fed. Reg.

at 82,096; NRC Responses to Public Comments, Final Rule: Amendment to AP1000 Design Certification Rule at 15-23 (Dec. 2011), *reprinted in* J.A. 268-76 (detailing public comments and explaining why no supplemental EA was necessary); *id.* at 44-45, *reprinted in* J.A. 280-81 (detailing the reasons no additional Severe Accident Design Mitigation Alternatives were necessary). NRC erred "on the side of high consequences" and concluded that the AP1000 EA "make[s] a convincing case that no identified [Severe Accident Mitigation Design Alternative] is worth the expense." NRC Responses to Public Comments at 45, *reprinted in* J.A. 281. Petitioners do not challenge this analysis, nor do they connect any of the Task Force recommendations to any alternative that NRC failed to consider. Without an explicit challenge, NRC appropriately relied on its 2011 EA in approving the final AP1000 rule amendment. Indeed, the Task Force Report "supports completing [the AP1000] design certification rulemaking activities without delay." Task Force Report at 71-72; *see also* AP1000 Design Certification Amendment, 76 Fed. Reg. at 82,083.

Petitioners have failed to demonstrate that NRC acted less than reasonably in declining to order a supplemental EA for the AP1000 design certification amendment. We therefore defer to the Commission's conclusion that such a supplement was unnecessary.

## V. CONCLUSION

For the foregoing reasons, the petition for review is *denied.*